| | |
|---|---|
| DAHL AUTOMOTIVE ONALASKA INC., GARBO MOTOR SALES, INC.,  GRIFFIN FORD LINCOLN FORT ATKINSON, INC., JIM OLSON FORD LINCOLN, LLC, KAYSER FORD, INC.,  KUNES COUNTRY FORD-LINCOLN, INC., LIDTKE MOTORS, INC.,  THE MOTOR COMPANY, INC., UPTOWN MOTORS, INC., V & H AUTOMOTIVE, INC., and Y & D CORP., | Case No. 3:20-cv-00932 |

Plaintiffs,

vs.

FORD MOTOR COMPANY,

Defendant.

## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

As noted in Ford Motor Company's ("Ford's") pending Motion for Summary Judgment (Dkt. 34), this case is quite simple: Plaintiffs' claims all hinge upon a series of erroneous assertions that have no support in the factual record: 1) that the Lincoln Commitment Program ("LCP") changes the prices at which vehicles are sold to the Plaintiff dealers by Ford;  2) that the Plaintiffs have some sort of claim or right to the disputed LCP payments without participation in the facility component of the LCP; and 3) that the LCP is a "performance standard" on which dealers are measured.  None of these assertions are true, and the Court will not find support for any of them in the evidence cited by Plaintiffs.  Plaintiffs claim in their Amended Complaint that the LCP changes their vehicle price, but have conceded in discovery that it doesn't.  Plaintiffs claim that the LCP "takes" something from them, but have conceded in discovery that they are not entitled to the payments in the first place.  Plaintiffs claim that the LCP is a "performance standard" on which they are measured, but have conceded in discovery that the program is

voluntary, and that they don't need to participate at all.

Instead, the LCP is a voluntary, annual program that Plaintiffs concede Ford is not required to offer at all. Accordingly, Plaintiffs have no claim or contractual right to any of the payments that can be *earned* by a dealer who chooses to participate in the program. For those dealers who do choose to participate in the program, the LCP seeks to implement various customer-facing amenities that cost dealers money – and as such it was designed to provide payments to participating dealers to help offset those costs. For the 2020 iteration of the LCP, Ford, after undertaking both internal and independent outside research to identify ways the Lincoln brand could better compete with other premium brands, concluded that implementing a "facility" component to the LCP would assist dealers in offsetting the costs of creating and maintaining an exclusive facility for Lincoln, as the research showed such facilities typically resulted in increased sales. Significantly, the LCP does not change or impact a dealer's vehicle price in any manner. Further, unlike sales expectancy or various performance standards used by Ford, the LCP – as conceded by Plaintiffs – is completely voluntary. Hundreds of dealers choose not to participate at all, and therefore it necessarily cannot be a performance standard used to measure dealers.

It is telling that Plaintiffs do not actually make any effort to analyze the statutes at issue in their Amended Complaint until 25 pages into their brief. No amount of legal wrangling, "interpretations," or efforts to obfuscate the issues by devoting page after page to immaterial matters, factually unsupported assertions, and questionable mathematics (based on incorrect assumptions and inadmissible evidence) can change the fact that – when actually analyzed against the requirements of the statutes at issue – there is no evidence to support any of

Plaintiffs' claims.[1]  Moreover, presumably resigned to the fact that the claims have no factual support, ***Plaintiffs attempt to seek summary judgment on claims that are not even in the case***; including: 1)  "claims" that are subject to a pending motion to amend (that should be denied); and 2) "claims" that Plaintiffs have just introduced for the first time in their motion for summary judgment.  This Court will find no authority for the proposition that Plaintiffs can obtain judgment in their favor on "claims" that are not even part of this litigation.

Plaintiffs' motion for summary judgment[2] should be denied.

## BACKGROUND

This matter concerns the Lincoln Commitment Program ("LCP"), which is a program Ford offers to its Lincoln dealers.  (Dkt. 37, M. DeYoung Dec. p. 2. ¶ 6.)  Participation is optional. (*Id.* p. 3, 6, ¶¶ 20, 24, 43.)  The LCP sets in place a series of customer-facing amenities such as car washes and loaner vehicles, and provides a payment to participating Lincoln dealers to help offset the costs of providing those items.  (*Id.* p. 2. ¶¶ 6, 7, 8.)

Beginning in 2020, the LCP added an optional facility element.  (Dkt. 38, S. McDermott

---

[1] As set forth in Ford's response to Plaintiffs' Proposed Statement of Material Facts, Plaintiffs improperly include argument in their statement, rely on inadmissible hearsay regarding the "cap rate," apply an "average" vehicle price that Ford's witnesses testified is no longer accurate, and then proceed to perform meaningless mathematical calculations estimating hypothetical earnings without any actual sales data, and – as noted by Ford – not considering that the LCP payments vary by model and options.  (*See. e.g.* Ford's Response to Plaintiffs' Proposed Statement of Material Facts, ¶¶ 49-52.)  Plaintiffs also offer various calculations to "conclude" some sort of "harm" to them, but disregard that, when pressed, they could not identify a single specific sale they lost as a result of the LCP.  (Dkt. 39, D. Dorsch Dep. 102:3-103:20); (Dkt. 42, J. Olson Dep. 51:18-52:16, 85:2-87:11); (Dkt. 41, T. Fohr Dep. 78:15-81:4, 9/29/2021); (Dkt. 43, T. Welch Dep. 66:8-67:11 9/23/2021).  As illustrated below – none of this "analysis" has anything to do with any of the actual enumerated claims in the Amended Complaint or any of the applicable statutes, and is simply smoke and mirrors designed to distract the Court from the straightforward nature of these claims.

[2] Plaintiffs do not seek summary judgment on the following counts in their amended complaint: Count VII (Violation of Violation Wis. Stat. § 133.04) or Count VIII (Injunctive Relief).

Dec. p. 2, 3 ¶¶ 19, 20, 22); (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 30, 43). Ford undertook both internal and independent outside research to identify ways the Lincoln brand could better compete with other premium brands. (Dkt. 38, S. McDermott Dec. p. 2, ¶ 16.) The data demonstrated that luxury customers preferred a brand exclusive facility experience and that having brand exclusive facilities would result in significantly faster sales growth for Lincoln dealers. (*Id.* p. 2 ¶ 17.) In order to address market trends, Ford created the 2020 iteration of the LCP. (*Id.* p. 2 ¶ 18.) Dealerships that had incurred costs in investing in Lincoln exclusivity, or who committed to do so, have the opportunity under the LCP to receive offsets on some of those costs. (*Id.* p 2, 3 ¶¶ 19, 20, 22.)

The offsets under the LCP associated with the facility portion are calculated based upon 1 to 2.75% of the Manufacturer's Suggested Retail Price ("MSRP") based on new vehicle sales to retail customers. (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19, 20, 22); (Dkt. 37, M. DeYoung Dec. p. 2. ¶ 8). ***Significantly, the MSRP is not the price a dealer pays for a Lincoln vehicle***. (Dkt. 37, M. DeYoung Dec. p. 2, ¶ 14.) The LCP does not change or in any manner impact the price at which a vehicle is sold to a dealer. (*Id.* p. 2, ¶ 15.) All dealers pay the invoice price for a new Lincoln, which is the same for all dealers. (*Id.* p. 2. ¶ 16); (Dkt. 39, D. Dorsch Dep. 44:13-24); (Dkt. 42, J. Olson Dep. 42:17-23); (Dkt. 41, T. Fohr Dep. 65:2-6); (Dkt. 43, T. Welch Dep. 31:15-19).

Plaintiffs are Lincoln dealers. (Dkt. 39, D. Dorsch Dep. 13:7-14:20); (Dkt. 42, J. Olson Dep. 11:2-12:10); (Dkt. 41, T. Fohr Dep. 8:22-9:20); (Dkt. 43, T. Welch Dep. 8:18-23, 14:25-15:1). Each has chosen to not fully participate in the facility portion of the LCP. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9). Each is free to make that

choice. (Dkt. 39, D. Dorsch Dep. 46:21-47:1); (Dkt. 42, J. Olson Dep. 50:3-8); (Dkt. 41, T. Fohr Dep. 43:3-8); (Dkt. 43, T. Welch Dep. 27:1-2); (Dkt, 37, M. DeYoung Dec. p. 6, ¶¶ 43-47); (Dkt. 38, S. McDermott Dec. p. 3 ¶¶ 20, 23-26). Each chose to not participate in the facility portion of the LCP based upon its own business decision to avoid the associated costs, which can be millions of dollars. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); (Dkt. 38, S. McDermott Dec. p. 1, ¶ 7). Each plaintiff is free to make that choice, and each is free to continue operating from its existing facility. (Dkt. 39, D. Dorsch Dep. 13:13-15, 93:7-17, 46:21-47:1); (Dkt. 42, J. Olson Dep. 23:7-10. 50:3-8); (Dkt. 41, T. Fohr Dep. 43:3-8, 53:19-23); (Dkt. 43, T. Welch Dep. 27:1-2, 50:13-21); (Dkt. 37, M. DeYoung Dec. p. 6, ¶¶ 43-47); (Dkt. 38, S. McDermott Dec. p. 3 ¶¶ 20, 23-26). The LCP, again, is optional, and is not a performance standard on which Plaintiffs are measured. (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 37, 43.)

## STANDARD OF DECISION

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I.  PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS IN THEIR AMENDED COMPLAINT.

#### A.  Plaintiffs Are Not Entitled To Summary Judgment In Their Favor On Count I – Violation of Wis. Stat. § 218.0116(1)(vm).

Plaintiffs are not entitled to summary judgment in their favor of Count I – Violation of Wis. Stat. § 218.0116(1)(vm) because the LCP does not change the price at which vehicles are sold to dealers, nor does it require or coerce any dealer to make changes to its facility and – even

if it did – it is undisputed that the LCP payments about which Plaintiffs complain are separate and valuable consideration for the facility improvements, and are therefore expressly permitted by the statute.

Wis. Stat. § 218.0116(1)(vm) states, in relevant part, that it is unlawful to be an auto manufacturer that:

> coerces or attempts to coerce a dealer or prospective dealer to improve dealership facilities at a substantial cost to the dealer or prospective dealer. This paragraph does not prohibit improvement of dealership facilities at a substantial cost to the dealer or prospective dealer if the dealer or prospective dealer has agreed to undertake the improvement and received a separate and valuable consideration for the improvement . . .

Wis. Stat. § 218.0116(1)(vm). Additionally, as noted by Plaintiffs, there is another exception if "the reasonable business considerations of the manufacturer and dealer justify improvement of dealership facilities." *Id.*

### 1. The LCP Does Not Change Vehicle Price, And Does Not Coerce Plaintiffs To Make Facility Improvements.

First, Plaintiffs allege that Ford has engaged in coercive activity by "increasing the price that plaintiffs pay Lincoln for vehicles." (Dkt. 23, Am. Compl. ¶ 61.) Plaintiffs also allege that Ford is "impos[ing] facility requirements" on them (Dkt. 23, Am. Compl. ¶ 62) and that Ford is "threatening termination" if they do not build a Vitrine.

Discovery has confirmed, however, that none of these allegations are true. The LCP does not change the price a dealer pays for a vehicle. (Dkt. 37, M. DeYoung Dec. p. 2. ¶ 15.) Indeed, Plaintiffs make a single, passing reference in their Statement of Proposed Findings of Fact to a "price change" by stating that "Ford returns a portion of that price to Lincoln dealers who meet certain performance standards under a program that Ford calls the Lincoln Commitment Program" – but ***none of the cited sources actually say that***. (Dkt. 50-1, Norman Dec. Ex. M, WIS1 12702-05 (explaining the manner in which LCP payments are earned, and at no point

identifying LCP as being a refund or as impacting or changing dealer price); (Dkt. 53, DeYoung Dep. 8:21, 10:1-23 (explaining how the LCP payments are calculated, and confirming it is unrelated to vehicles purchased by the dealers). This is because this "price change" or "refund" identified by the Plaintiffs is a fabrication. In fact, Plaintiffs concede that all dealers pay the same price for vehicles when they purchase them from Ford.[3] (Dkt. 39, D. Dorsch Dep. 44:13-24); (Dkt. 42, J. Olson Dep. 42:17-23; (Dkt. 41, T. Fohr Dep. 65:2-6, 9/29/2021); (Dkt. 43, T. Welch Dep. 31:15-19, 9/23/2021); (*See also* Dkt. 37, M. DeYoung Dec. p. 2. ¶ 16). The LCP does not change the dealer's vehicle price at all, and there is no evidence to the contrary.

Instead, the 2.75% facility portion of the LCP is designed to help participating dealers offset their costs associated with building and operating an exclusive store. (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22.) All of the Plaintiffs concede that they are eligible to participate in the LCP. (Dkt. 39, D. Dorsch Dep. 93:18-93:24); (Dkt. 42, J. Olson Dep. 57:14-20); (Dkt. 41, T. Fohr Dep. 51:14-17); (Dkt. 43, T. Welch Dep. 52:1-3). Plaintiffs also concede that, despite being eligible, they have chosen to not participate in the facility portion of the LCP because they do not want to incur the costs. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); *see also* (Dkt. 38 S. McDermott Dec. p. 1, ¶ 7). Thus, Plaintiffs are not incurring any of the costs the 2.75% LCP payment is designed to help offset. (*Id.*); (*See also* Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22). Plaintiffs concede that they are not being required to build a Vitrine, and that they are free to continue operating as Lincoln dealers in their

---

[3] As further confirmation that LCP does not change a dealer's vehicle price, all four Plaintiffs conceded that in the event of a trade with another dealer, it is the dealer who sells the vehicle at retail who earns the payments. ***The dealer who actually purchased the vehicle from Lincoln receives nothing because*** – again – LCP does not change the dealers' price. (Dkt. 39. D. Dorsch Dep. 77:15-19); (Dkt. 42, J. Olson Dep. 71:25-72:8); (Dkt. 41, T. Fohr Dep. 66:15-21); (Dkt. 43, T. Welch Dep. 43:4-11).

existing stores. (Dkt. 39, D. Dorsch Dep. 13:13-15, 93:7-17); (Dkt. 42, J. Olson Dep. 47:18-25); (Dkt. 41, T. Fohr Dep. 53:19-23); (Dkt. 43, T. Welch Dep. 80:3-6). As the LCP is optional, dealers who do not participate are not at risk of termination. (*See id.*); (*See also* Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 35, 43).

Presumably because there is no price change to point to, Plaintiffs devote three pages of their brief toward defining the word "coerce." Unsurprisingly, Plaintiffs do not actually identify any evidence showing any actions of Ford that could possibly be coercive. Plaintiffs suggest that the introduction of the facility component of the LCP somehow takes something from them, and devote a significant number of pages to discussing payment amounts available under ***prior iterations*** of the LCP (*See* Plaintiffs' Brief at 29) – but this is immaterial because the program expires annually, and those prior programs with those prior payment percentages no longer exist. (Dkt. 37, M. DeYoung Dec. p. 2, ¶ 11.) In fact, ***Plaintiffs concede that Ford is not required to offer the LCP at all; it is an optional program that Ford can end at any time, and does not arise from the parties' contracts***. (Dkt. 39, D. Dorsch Dep. 48:22-49:1); (Dkt. 42, J. Olson Dep. 43:19-23); (Dkt. 41, T. Fohr Dep. 49:10-13, 53:7-18); (Dkt. 43, T. Welch Dep. 44:10-17, 9/23/2021); (*See also* Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 40, 43). The Court will find no citation to any document or testimony suggesting that Plaintiffs' have some sort of claim to payments under prior, expired versions of the LCP – because no such evidence exists. Plaintiffs' also claim that the LCP creates a "Morton's Fork" that creates a "competitive disadvantage" of some kind but – again – there is no evidence to support this. Plaintiffs concede that the LCP facility funds are designed to help offset facility costs – and that they have chosen not to incur those costs. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); (Dkt.

38, S. McDermott Dec. p. 1, ¶ 7).  Those Lincoln dealers receiving the LCP facility payments, however, have incurred (or have agreed to incur) those costs.  (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19, 20, 22.)  Plaintiffs further conceded in their depositions that they could identify no specific sales somehow lost as a result of the LCP. (Dkt. 39, D. Dorsch Dep. 102:3-103:20); (Dkt. 42, J. Olson Dep. 51:18-52:16, 85:2-87:11); (Dkt. 41, T. Fohr Dep. 78:15-81:4, 9/29/2021); (Dkt. 43, T. Welch Dep. 66:8-67:11 9/23/2021).  In short, the claimed "competitive disadvantage" has neither factual support nor any basis in reality.[4]

Put simply, Plaintiffs concede they have no right or claim to the LCP payments at all – the 2020 LCP payments are consideration paid to participating dealers in exchange for those dealers undertaking certain tasks – nothing more.  Plaintiffs have chosen not to participate, and that is fine, but they demand to be compensated for *their lack of participation* in the same manner as a dealer that is otherwise incurring the costs to participate.  Similarly, Plaintiffs' cannot identify any improper, adverse, coercive action taken by Ford with respect to the LCP because these allegations again are based on the false assertion that the LCP changes a dealer's vehicle price, or that the dealers have had something taken from them to which they are entitled. As set forth above, neither of these things are true.

Perhaps nothing best illustrates the dearth of evidence than Plaintiffs' own brief. Plaintiffs are forced to concede that they are engaged in an exercise of trying to morph the LCP into something it is not.  Indeed, on page 30, Plaintiffs simultaneously suggest that the LCP is a price change (without citation) and also that "[v]iewed another way" – *maybe* – it is

---

[4] In fact, the central irony of Plaintiffs' claims is that they attempt to create a competitive disadvantage in *their* favor.  They do not want to spend the money the LCP facility funds are designed to offset, but they want to be paid the money anyway.  Thus, other Lincoln dealers will have potentially millions in facility-related costs that Plaintiffs have avoided, while Plaintiffs receive the 2.75% for free.

"withholding" or "reducing" something (again without citation).  The time for speculation and theorizing is over.  The LCP cannot be both, and the lack of evidence to support either of these "interpretations" underscores that Plaintiffs simply have no factual basis for their claims.

Plaintiffs' motion for summary judgment should be denied.

2.  **Plaintiffs Fail To Address The Carve Out Concerning Separate And Valuable Consideration For Improvements.**

Second, even if the LCP involved a price change (which it does not) or was in some manner coercive (which it is not), Plaintiffs failed to address that the statute, by its express terms, still would not be applicable here.  The statute expressly states "***This paragraph does not prohibit improvement of dealership facilities at a substantial cost to the dealer or prospective dealer if the dealer or prospective dealer has agreed to undertake the improvement and received a separate and valuable consideration for the improvement*** . . .  Wis. Stat. § 218.0116(1)(vm). (emphasis added).)

Here, Plaintiffs complain that they do not wish to spend the money on facility improvements, which they acknowledge to be substantial.  (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9).  It is undisputed, however, that the 2.75% facility portion of the LCP about which Plaintiffs complain is designed to help participating dealers offset their costs associated with building and operating an exclusive store.  (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22.)  Plaintiffs, again, concede that they have chosen to not incur those costs.  (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); (*See also* Dkt. 38, S. McDermott Dec. p. 1, ¶ 7).

Thus, even if the statute applied, the 2.75% payment under the LCP is separate and

valuable consideration provided by Ford for the improvement to the facilities. (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22.) Wis. Stat. § 218.0116(1)(vm) is not applicable here by virtue of this carve out. Plaintiffs' Motion for Summary Judgment should be denied.

### 3. Although Not Required Because The Statute Does Not Apply, Ford Has Reasonable Business Considerations To Support The LCP.

Finally, although the lack of any evidence of a price change or coercion, coupled with the consideration for the improvements, are dispositive, summary judgment in favor of Plaintiffs also is inappropriate because the LCP is based upon the reasonable business considerations of Ford. Indeed, Ford has presented data showing that exclusive and "de-dualed" stores typically see an increase in sales greater than that of the Lincoln brand as a whole. (Dkt. 54, S. McDermott Dep. 66:16 - 71:12.) Additionally, the majority of stores that have gone exclusive have seen significant sales growth that outpaces other stores. (*Id.*) These reasons are dispositive, but – at the very least – create issues of material fact as to the reasons and potential benefits of exclusive stores, rendering summary judgment in favor of Plaintiffs inappropriate.[5]

### B. Plaintiffs Are Not Entitled To Summary Judgment In Their Favor On Count II – Violation of Wis. Stat. § 218.0116(1)(wm).

As yet another example of Plaintiffs' efforts to obfuscate the facts that Plaintiffs do not

---

[5] Plaintiffs again construct arguments in their motion that are not supported by admissible evidence. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Moreover, Plaintiffs also make the false and unsupported assertion that the Plaintiffs are somehow receiving $600 to $1,650 less *profit* on vehicles sold – but Plaintiffs cite nothing in support of this, nor can they. It is undisputed that LCP is designed to offset costs, and that Plaintiffs have chosen not to incur those costs, and that those dealers who have incurred the costs have spent millions that Plaintiffs have not. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); (Dkt. 38, S. McDermott Dec. p. 1, ¶ 7). There is no evidence that Plaintiffs have lost some sort of "profit."

like, Plaintiffs attempt to conflate their claims under Count II – Violation of Wis. Stat. § 218.0116(1)(wm) with those under Count I. These claims, however, are not the same. Wis. Stat. § 218.0116(1)(wm) states, in relevant part, that it is unlawful to be a manufacturer that:

> unreasonably requires or coerces or attempts to coerce a dealer to provide or maintain exclusive facilities for a particular line make of motor vehicles or unreasonably refuses to permit or approve the addition of another line make to the dealership facilities of a dealer taking into consideration the reasonable business considerations of the manufacturer, importer, or distributor and the dealer.

Wis. Stat. § 218.0116(1)(vm).

Plaintiffs allege, again, that Ford has engaged in coercive activity by "increasing the price that plaintiffs pay Lincoln for vehicles." (Dkt. 23, Am. Compl. ¶ 68.) Plaintiffs further allege that they are being required to provide exclusive facilities. (Dkt. 23, Am. Comp. 67.)

As noted above, the LCP does not change the price a dealer pays for a vehicle. (Dkt. 37, M. DeYoung Dec. p. 2. ¶ 15.) Plaintiffs concede that all dealers pay the same price for vehicles when they purchase them from Ford. (*Id.* p. 2. ¶ 16); (Dkt. 39, D. Dorsch Dep. 44:13-24,); (Dkt. 42, J. Olson Dep. 42:17-23); (Dkt. 41, T. Fohr Dep. 65:2-6); (Dkt. 43, T. Welch Dep. 31:15-19, 9/23/2021). The LCP is available to all dealers and is the same for all dealers. (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 31, 43.) The 2.75% facility portion of the LCP is designed to help participating dealers offset their costs associated with building and operating an exclusive store. (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22.) Plaintiffs concede that they have chosen to not incur those costs. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9, 9/23/2021); *see also* (Dkt. 38, S. McDermott Dec. p. 1, ¶ 7). Thus, Plaintiffs are not incurring any of the costs the 2.75% LCP payment is designed to help offset. (*Id.*); (*See also* Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22). Further, Plaintiffs conceded they do not have

any claim to LCP payments at all, and that Ford can change the voluntary program at any time. (Dkt. 39, D. Dorsch Dep. 48:22-49:1); (Dkt. 42, J. Olson Dep. 43:19-23); (Dkt. 41, T. Fohr Dep. 49:10-13, 53:7-18); (Dkt. 43, T. Welch Dep. 44:10-17, 9/23/2021); (*See also* Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 40, 43). Thus, any assertion that funds are no longer being "returned" to Plaintiffs that Plaintiffs have some sort of claim to is simply false – and Plaintiffs have not (and cannot) cite any evidence to support this fabrication. As this claim has no factual support in the record, the claim of "coercion" necessarily fails.

Plaintiffs also concede that they are not being required to build a Vitrine or an exclusive store. (Dkt. 39, D. Dorsch Dep. 13:13-15); (Dkt. 42, J. Olson Dep. 47:18-25, 9/27/2021); (Dkt. 41, T. Fohr Dep. 53:19-23); (Dkt. 43, T. Welch Dep. 80:3-6). Moreover, Dorsch, Olson, and Kunes all conceded that they are free to continue operating their current stores, which are dualed with Ford, and Ford has not told them otherwise. (*Id.*) In fact, Dorsch also has a Kia store under the same roof and concedes that it is free to continue operating from that facility.[6] (Dkt. 39, D. Dorsch Dep. 13:13-15, 93:7-17.) Thus, Plaintiffs' assertion that they are being "coerced" or required to create exclusive facilities has no support in the factual record.

The LCP does not violate Wis. Stat. § 218.0116(1)(wm). It does not change prices, and therefore the LCP necessarily does not and cannot use this phantom "price change" to "coerce" the Plaintiff dealers into providing exclusive facilities. Plaintiffs further are not having anything taken from them, and they concede they can stay in their current facilities. Plaintiffs' motion for summary judgment should be denied.

**C.** **Plaintiffs Are Not Entitled To Summary Judgment In Their Favor On Count III – Violation of Wis. Stat. § 218.0116(1)(z).**

---

[6] Lidtke has an exclusive store, albeit one that has not been updated in decades. (Dkt. 43, T. Welch Dep. 27:14-29:14.)

Ford is entitled to Summary Judgment in its favor on Count III – Wis. Stat. § 218.0116(1)(z) because – once again –the LCP does not change the price at which vehicles are sold to dealers, nor does it result in Plaintiffs losing something to which they are entitled. Wis. Stat. § 218.0116(1)(z) states, in relevant part, that it is unlawful for a manufacturer to take an "adverse action" by:

  a.  Increasing a price charged for services or goods.

  ***

  c.  Withholding, reducing, or delaying an incentive or other payments.

  ***

  f.  Failing to Act in good faith.

  ***

  g.  Establishing or applying a discriminatory standard

Wis. Stat. § 218.0116(1)(z).

Plaintiffs allege that, by "increasing the price that plaintiffs pay Lincoln for vehicles," Ford has committed an adverse action that constitutes both a price increase and the withholding of payments. (Dkt. 23, Am. Compl. ¶ 73.)

As noted above, the LCP does not change the price a dealer pays for a vehicle. (Dkt. 37, M. DeYoung Dec. p. 2, ¶ 15.) Plaintiffs concede that all dealers pay the same price for vehicles when they purchase them from Ford. (Dkt. 39, D. Dorsch Dep. 44:13-24); (Dkt. 42, J. Olson Dep. 42:17-23); (Dkt. 41, T. Fohr Dep. 65:2-6); (Dkt. 43, T. Welch Dep. 31:15-19); (*See also* Dkt. 37, M. DeYoung Dec. p. 2, ¶ 16.) The LCP is available to all dealers and is the same for all dealers. (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 31, 43.) The 2.75% facility portion of the LCP is designed to help participating dealers offset their costs associated with building and operating an exclusive store. (Dkt. 38, S. McDermott Dec. p. 2, 3, ¶¶ 19-20, 22.) Plaintiffs concede that they

have chosen to not incur those costs. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20, 9/27/2021); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); (*See also* Dkt. 38, S. McDermott Dec. p. 1, ¶ 7). Thus, Plaintiffs are not incurring any of the costs the 2.75% LCP payment is designed to help offset. (*Id.*); (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22).

Further, as noted above, nothing is being "withheld." Plaintiffs concede that Ford is not required to offer the LCP at all; it is an optional program that Ford can end at any time, and does not arise from the parties' contracts, and Plaintiffs have no basis to claim any of it without participating. (Dkt. 39, D. Dorsch Dep. 48:22-49:1); (Dkt. 42, J. Olson Dep. 43:19-23); (Dkt. 41, T. Fohr Dep. 49:10-13, 53:7-18); (Dkt. 43, T. Welch Dep. 44:10-17); (Dkt. 38, M. DeYoung Dec. p. 5, 6, ¶¶ 40, 43). As Plaintiffs have not *earned* the LCP payments and otherwise do not have any claim to them, they necessarily cannot be withheld.

Plaintiffs also apparently seek to amend their Amended Complaint (again) via their motion for summary judgment, and now try to add claims under this statute that Ford is "[f]ailing to Act in good faith" or is "[e]stablishing or applying a discriminatory standard." (Dkt. 51 at p. 32.) These claims are not in the Amended Complaint and should be disregarded. In any event, Plaintiffs do not offer any argument or evidence in support of the same in their brief, and instead incorporate and rely exclusively upon their arguments in support of Counts IV and V. (*Id.*) As those claims fail for the reasons set forth below in in Sections II.D and II. E, they necessarily fail here as well.

**D.    Plaintiffs Are Not Entitled To Summary Judgment In Their Favor On Count IV - Wis. Stat. §§ 218.0124 and 218.0116(1)(km).**

Plaintiffs' claims under Count IV – Wis. Stat. §§ 218.0124 and 218.0116(1)(km) fail because the LCP is not a "performance standard," and there is not a single piece of evidence to

15

the contrary.  Wis. Stat. § 218.0124 states:

> ***Any performance standard or program for measuring dealership performance*** that may have a material effect on a dealer, and the application of any such standard or program by a manufacturer, importer or distributor, shall be fair, reasonable and equitable.  Upon the request of any dealer, a manufacturer, importer or distributor shall disclose in writing to the dealer a description of how a performance standard or program is designed and all relevant information used in the application of the performance standard or program to that dealer.

Wis. Stat. § 218.0124 (emphasis added).  Wis. Stat. § 218.0116(1)(km) makes violating Wis. Stat. § 218.0016(1)(km) actionable in litigation.

There is no admissible evidence to support the assertion that the LCP is a performance standard used to measure dealer performance.  Instead, the only admissible evidence is that it ***is not***.  As explained by Mike DeYoung of Ford:



(Dkt. 53, DeYoung Dep. 187:3-22 (emphasis added).)  Moreover, as noted above, each Plaintiff conceded that the LCP is optional and that they do not have to participate in any part of it.  (Dkt.

39, D. Dorsch Dep. 48:22-49:1); (Dkt. 42, J. Olson Dep. 43:19-23); (Dkt. 41, T. Fohr Dep. 49:10-13, 53:7-18); (Dkt. 43, T. Welch Dep. 44:10-17). In fact, roughly 100 dealers do not participate in LCP at all. (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 37-38, 43.)

While Ford has metrics that measure items like sales expectancy and are applied to all dealers to assess their performance, ***the LCP is not one of them***. (*Id.* p. 5, 6, ¶¶ 37, 43.) The LCP is nothing more than a voluntary program that a dealership can *choose* to participate in, or not, based on each dealer's own determination of what is best for its business. (*Id.* p. 5, 6, ¶¶ 30, 43); (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); (Dkt. 38, S. McDermott Dec. p. 1, ¶ 7).

As with the "price changes" and "rebates," Plaintiffs attempt to ignore the record evidence and try to manufacture a "performance standard" out of thin air by scouring documents for the words "performance" and "standard" in a effort to turn a voluntary program into something it is not. (Dkt. 51, p. 33-34.) The Court should not be distracted by these antics. Does a dealer who "performs" under the LCP earn a payment? Certainly. Does the LCP contain certain criteria or standards that should be satisfied if a dealer wants to earn the associated offset payment? Yes. But these basic facts do not change a voluntary, optional program into a "performance standard or program ***for measuring dealership performance*** that may have a material effect on a dealer" under Wisconsin law, and there is no authority or evidence to support such a position.

Indeed, those cases addressing Wis. Stat. § 218.0124 illustrate that "performance standards" under Wisconsin law are required metrics against which dealers are measured, such as sales, and which may be used by the manufacturer in the decision-making process as it relates to purchasing new dealerships or establishing new locations. *See Northgate Motors, Inc. v. GMC,*

111 F. Supp. 2d 1071, 1079 (E.D. Wis. 2000) (discussing an automotive performance standard under Wis. Stat. § 218.0124 used to deny an individual's request to purchase dealership assets); *Racine Harley-Davidson v. Harley-Davidson Motor Co.*, 2008 WI App 135, ¶ 19, 313 Wis. 2d 831, 756 N.W.2d 810 (concerning denial of a dealer's request to open a second location based upon the dealer's poor scores under a customer service performance metric).

Even the cases cited by Plaintiffs from other jurisdictions confirm that "performance standard" means a required metrics on which dealers are measured against one another. *See Beck Chevrolet Co. Inc. v. General Motors LLC*, 53 N.E.3d 706, 713 (N.Y. 2016) (concerning GM's Retail Sales Index, or "RSI" used as a tool to measure dealer performance, as it related to the dealer fulfilling its sales obligations and whether that dealer would continue operating); *Beck Chevrolet Co. Inc. v. General Motors LLC*, 787 F.3d 663, 675 (3rd Cir. 2015) (same); *Landmark Chevrolet Corp. v. General Motors Corp.*, No. 02-0002 LIC, at 20-21 (Tex. Mot. Veh. Bd. Sept. 16, 2004) (concerning mandatory metric used for measuring and comparing the sales of all dealers). In short, there is neither evidence, nor authority, for Plaintiffs' assertion that a voluntary program such as the LCP is a "performance standard" as used in Wis. Stat. § 218.0124.

Finally, even if the LCP was somehow a "performance standard" (which it is not), Plaintiffs' claims still fail because the LCP does not have a material effect on them. Plaintiffs provide self-serving declarations seeking to claim that the LCP somehow impacts their sales performance – but they do not cite any evidence for this outside of their own assumptions and inadmissible opinions. Indeed, each Plaintiff testified that they could not identify any specific sale they lost as a result of the LCP. (Dkt. 39, D. Dorsch Dep. 102:3-103:20); (Dkt. 42, J. Olson Dep. 51:18-52:16, 85:2-87:11); (Dkt. 41, T. Fohr Dep. 78:15-81:4, 9/29/2021); (Dkt. 43, T. Welch Dep. 66:8-67:11 9/23/2021). Plaintiffs cannot obtain summary judgment in their favor

based on nothing more than their groundless speculation of why their sales may be down – they are required to provide undisputed evidence. Such evidence does not exist. Further, Plaintiffs continue to assert – inaccurately – that they are "harmed" because the 2.75% is "taken" from them, but again, they have conceded that they have no right to it without participation, and they have conceded that they have not incurred any of the costs it is designed to offset. (Skt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 43, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9, 9/23/2021).

The Court also should be advised that, as with the imaginary "refunds" and price changes, Plaintiffs once again provide "facts" to the Court in support of their arguments that are not true, and are not supported by the cited evidence. Plaintiffs' assert that "[a]ccording to Ford executives, Ford created the Brand Exclusivity Standard in response to requests from its National Dealer Council members to reduce dealer count…" (Dkt.51, Plaintiffs' Brief, p. 36.) This is a complete fabrication. The cited evidence are passages from the depositions of Mike DeYoung and Shawn McDermott of Ford, neither of whom say anything about the reasons for the creation of the brand exclusivity elements of the LCP in the cited passages, and neither of whom say anything about that element being created at the request of the dealer council. (*See* Dkt. 38, McDermott Dep. 93:5-10 (discussing issues outside of LCP and making no references to brand exclusivity); 107:3-15 (discussing average industry throughput and making no reference to LCP or brand exclusivity); (Dkt. 37, DeYoung Dep. 27:13-25; 28:1-13 (discussing how members of the dealer council are chosen). Plaintiffs also falsely state, again without citation to admissible evidence, that Ford has a "goal" of having small market dealers surrender their franchises. (Dkt. 51, Plaintiffs' Brief at p. 24.) In fact, the cited testimony says no such thing, and Ford's witnesses expressly testified that there is no such initiative, ██████████████████████

[REDACTED] Plaintiffs cannot invent "facts" out of whole clothe and then use the same to seek summary judgment.[7] Instead, the record evidence shows that the LCP was created to *help* dealers that wanted to invest to offset their costs. (*See Id*. p. 2, ¶ 8, 11/10/2021.)

Regardless, Plaintiffs' claims here are a classic example of plaintiffs attempting to have their cake and eat it too. Plaintiffs do not want to spend the money on facilities that their competitors have spent, but they still want the offset payments – and they make the remarkable assertion that not receiving money to help offset expenses they have *intentionally not incurred* somehow "harms" them.

Plaintiffs' motion for summary judgment should be denied.

**E.**    **Plaintiffs Are Not Entitled To Summary Judgment In Their Favor On Count V – U.C.C. 2-305(2), Nor Can Plaintiffs Bring A "Good Faith" Claim Under A U.C.C. Statute That Has Not Been Identified As The Basis Of Any Claim In Any Pleading.**

Plaintiffs are not entitled to summary judgment on  Count V – Violation of "U.C.C. 2-305(2)" because, once again, the LCP does not change the price a dealer pays for a vehicle. Ford presumes that Plaintiffs' reference to "U.C.C. 2-305(2)" is intended to refer to Wis. Stat. § 402.305(2)

---

[7] Plaintiffs also falsely state, without citation to the record, that "Ford admits to providing large market dealers additional assistance to comply with the standard." (Dkt. 51 at p. 37.) This is untrue, and as there is no citation to anything, the Court should disregard it.

> (1)     The parties if they so intend can conclude a contract for sale even though the price is not settled . . .
>
> (2)     A price to be fixed by the seller or by the buyer means a price for that party to fix in good faith.

Wis. Stat. § 402.305.

Plaintiffs allege, yet again, that Ford is "increasing the prices that the plaintiffs must pay for vehicles they purchase from Lincoln." (Dkt. 23, Am. Compl. ¶ 86.) As noted above, this is untrue – Plaintiffs concede that all dealers pay the same price for vehicles when they purchase them from Ford. (Dkt. 38, M. DeYoung Dec. p. 2. ¶¶ 15-16); (Dkt. 37, D. Dorsch Dep. 44:13-24); (Dkt. 42, J. Olson Dep. 42:17-23); (Dkt. 41, T. Fohr Dep. 65:2-6); (Dkt. 43, T. Welch Dep. 31:15-19). Indeed, all dealers concede that they pay "invoice price" – thus there is not even an "open price" term – the price is fixed. (*Id.*) Plaintiffs, tellingly, do not offer any evidence, nor can they, that there is some sort of open price term. Plaintiffs are not entitled to summary judgment on this claim. Wis. Stat. § 402.305 is not applicable.

Continuing their 11th hour gamesmanship, Plaintiffs also move for summary judgment in their favor for a claim of violation of the duty of good faith and fair dealing under Wis. Stat. § 401.304. ***This is not one of Plaintiffs' claims and does not appear anywhere in the Amended Complaint***. Plaintiffs identify this "claim" in their motion for summary judgment as part of the "proposed second amended complaint" – but that also is inaccurate. It was only *after* Ford pointed out in response to Plaintiffs' untimely motion to amend that such a claim could not exist independent of contract that Plaintiffs now attempt to rewrite their claims yet again, this time during the motion for summary judgment. The Court should not permit this type of gamesmanship.

Regardless, Plaintiffs do not have any sort of breach of the duty of good faith claim and they cite no evidence of any actions undertaken without good faith by Ford. Instead, Plaintiffs

simply point once again to a phantom price difference that does not exist, and falsely claim that this imaginary price difference was somehow undertaken in "bad faith."

Plaintiffs appear to bring this "claim" concerning their Michigan contracts with Ford, which are governed under Michigan law. (Dkt. 36-1, Lincoln Sales and Service Agreement, Standard Terms and Conditions § 32.) Michigan[8] does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing apart from a claim for breach of the contract itself. *Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 411, 295 N.W.2d 50 (1980). The limited exception to this rule applies to breach of contract claims when "a party to a contract makes the manner of its performance a matter of its own discretion." *Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 243, 357 N.W.2d 669 (1984). Where a complainant fails to allege that the contract at issue leaves the manner of performance to a defendant's discretion, such a claim is properly dismissed. *McLiechey v. Bristol W. Ins. Co.*, 408 F. Supp. 2d 516 (W.D. Mich. 2006).

Plaintiffs have not identified a specific contract provision applicable to the LCP that is left to Ford's discretion, or how Ford exercised that discretion (concerning this non-existent contractual provision) without good faith.[9] In fact, Plaintiffs conceded that Ford is not required

---

[8] Even if Wisconsin law applied here, the result would be no different, because while Wisconsin law recognizes the implied contractual duty of good faith and fair dealing in commercial contracts (*See Market St. Assocs. Ltd. Partnership v. Frey*, 941 F.2d 588, 593-94 (7th Cir. 1991)), the implied covenant "does not support an independent cause of action for failure to act in good faith under a contract." *Hauer v. Union State Bank*, 192 Wis. 2d 576, 597, 532 N.W.2d 456, 464 (Ct. App. 1995).

[9] Plaintiffs – once again trying to amend their complaint in their motion for summary judgment, now identify for the first time a provision of the dealer agreements concerning advertising and promotional items that they attempt to wedge the LCP into. (Dkt. 51, Plaintiffs' Brief at p. 41.) Plaintiffs, however, all conceded in their depositions that LCP is not a customer-facing incentive program. (Dkt. 39, D. Dorsch 77:20-80:18; Dkt. 42, J. Olson 73:11-75:8); (Dkt. 41, T. Fohr Dep. 67:3-68:23); (Dkt. 43, T. Welch 45:12-46:15, 48:18-51:7.) As such, even if the Court could suddenly consider this new claim, it fails because the referenced section is not

to offer the LCP at all; it is an optional program that Ford can end at any time, and does not arise from the parties' contracts. (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 40, 43); (Dkt. 39, D. Dorsch Dep. 48:22-49:1); (Dkt. 42, J., Olson Dep. 43:19-23); (Dkt. 41, T. Fohr Dep. 49:10-13, 53:7-18); (Dkt. 43, T. Welch Dep. 44:10-17). Further, Plaintiffs do not even identify (nor can they) any purported acts by Ford that would be in bad faith. Instead, the contrary is true – the LCP is a program designed to *benefit* dealers such as Plaintiffs in supporting their investment in the Lincoln brand by helping to offset certain costs. (Dkt. 37, M. DeYoung Dec. p. 2. ¶ 8); (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22). The LCP is available to all dealers and is the same for all dealers. (Dkt. 38, M. DeYoung Dec. p. 5, 6, ¶¶ 31, 43.) As Plaintiffs have not identified, and cannot identify, any contractual obligation subject to Ford's discretion that has not been acted upon in good faith by Ford, the claim fails.

This "good faith" claim is not a part of this litigation, but even if it were, Plaintiffs would not be entitled to summary judgment.

**F.      Plaintiffs Are Not Entitled To Summary Judgment In Their Favor On Count VI – Violation Section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13(a)).**

The Plaintiffs are not entitled to Summary Judgment in their favor on Count VI – Violation of Section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13(a)) because, as noted above, the LCP does not change the price a dealer pays for a vehicle. Moreover, even if Section 13(a) was in some manner applicable to the LCP (which it is not), Plaintiffs' claims still would fail because they cannot establish any of the necessary elements of a Section 2(a) claim.

*First,* Plaintiffs' claims under the Robinson-Patman Act fail because Ford is not selling Lincoln vehicles to dealers at different prices. As explained by the U.S. Supreme Court, "[A]

---

applicable, nor does this provision identify anything left to Ford's discretion that could relate to the LCP.

price discrimination within the meaning of [§13(a)] is merely a difference in price.'" *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 558 (1990) (quoting *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960)). Plaintiffs concede that all dealers pay the same price for vehicles when they purchase them from Ford. (Dkt. 39, D. Dorsch Dep. 44:13-24); (Dkt. 42, J. Olson Dep. 42:17-23); (Dkt. 41, T. Fohr Dep. 65:2-6); (Dkt. 43, T. Welch Dep. 31:15-19); (*See also* Dkt. 37, M. DeYoung Dec. p. 2. ¶¶ 15-16). Plaintiffs concede voluntarily participating in the LCP causes them to incur costs. (Dkt. 39, D. Dorsch Dep. 63:10-70:5); (Dkt. 42, J. Olson Dep. 48:6-51:12); (Dkt. 41, T. Fohr Dep. 54:13-58:19); (Dkt. 43, T. Welch Dep. 63:15-64:24). The LCP payments are designed to help dealers that choose to participate in the program offset those costs. (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22.) Plaintiffs concede that they have chosen to not incur the costs associated with the exclusive facility component. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9, 9/23/2021); (*See also* Dkt. 38, S. McDermott Dec. p. 1, ¶ 7). Thus, Plaintiffs necessarily are not incurring the costs the 2.75% is designed to offset. (*Id.*); (Dkt. 38, S. McDermott Dec. p. 2, 3 ¶¶ 19-20, 22). Plaintiffs even concede in their Briefing that they have no evidence of a price differential – instead they suggest that the LCP could be "viewed" as such if taken through the Plaintiffs' lens – and in disregard of all evidence to the contrary. The LCP does not change vehicle price, and there is no evidence that it does. Plaintiffs cannot obtain summary judgment in their favor by imagining or "viewing" a price differential into existence when it is undisputed that it does not exist.

*Second*, even accepting, *arguendo*, Plaintiffs' tortured construction of the LCP as a price difference (which it is not and Ford strongly denies), the Section 2(a) claim would still fail because the LCP is functionally available to all Lincoln dealers. In order to succeed on a 13(a)

claim, a price difference must not be "functionally available" to the plaintiffs. *Metro Ford Truck Sales v. Ford Motor Co,*, 145 F.3d 320, 326 (5th Cir. 1998) (noting functional availability "is a judicial graft on § [13](a) and is not explicitly embodied in the text of the statute. Nevertheless, the theory is clear and coincides with the purpose of the Act in that a price discount equally available to all purchasers for the same customer and product is not price discrimination."); *Metro Ford Truck Sales v. Ford Motor Co,*, 145 F.3d 320, 326 (5th Cir. 1998) (internal quotations omitted). "[A] discount is functionally available when objective standards exist to guide . . . in qualifying for the category of purchasers receiving the discount." *Century Hardware Corp. v. Acme United Corp.*, 467 F. Supp. 350, 355 (E.D. Wisc. 1979). Pricing changes that are a result of a purchaser's smaller investment in its business are still functionally available to that purchaser. *Krist Oil Co. v. Bernick's Pepsi-Cola of Duluth, Inc.* (*Krist Oil I*), 354 F. Supp. 2d 852, 856-857 (W.D. Wisc. 2005) (prices were functionally available and not price discrimination because "the lowest case price is unavailable to plaintiff not because of its disproportionately small purchasing power but because of other unrelated investments plaintiff made.") *Id.* at 857.

Plaintiffs rely upon *FTC v. Morton Salt*, 334 U.S. 37, 42 (1948), but that case stands only for the proposition that certain **volume-based discounts** may not functionally be available in certain circumstances. Here, it is undisputed that the LCP payments are calculated the same for all dealers regardless of the number of vehicles purchased from Lincoln – volume is not a part of it. (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 31, 43.) The facility component of the LCP is available to all dealers, regardless of size or location, on the same terms. (*Id*. p. 5, 6, ¶¶ 31, 43.) Each of the Plaintiffs concede that they have the opportunity to participate, but have simply made the business decision not to. (Dkt. 37, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T.

Welch Dep. 52:4-9); (*See also* Dkt. 38, S. McDermott Dec. p. 1, ¶ 7). Thus, even if the LCP was a "price difference" governed by the statute, it is functionally available to Plaintiffs.

*Third*, Plaintiffs' claims under Section 2(a) of the Robinson-Patman act fail because none of the Plaintiffs has been able to articulate any specific injury or any favored purchaser. Plaintiffs again inappropriately rely on *Morton Salt* for the proposition that they do not need to show an actual injury. Plaintiffs are mistaken, because *Morton Salt* concerns the tests applicable to the Federal Trade Commission, and does not concern a private cause of action brought by a private party. *See Morton Salt*, 334 U.S. at 42; *see also* 15 U.S.C. § 13(a)(b)(noting a rebuttable presumption as it relates to the Federal Trade Commission). Private causes of action under section 2(a) of the Robinson-Patman Act are authorized under § 4 of the Clayton Act, 15 U.S.C. § 15(a), which allows private suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," and therefore the U.S. Supreme Court has concluded that a plaintiff must show an actual injury in order to have a claim. *J. Truett Payne Co. v. Chrysler Motors*, 451 U.S. 557, 562, 68 (1981); *see also Krist Oil Co. v. Bernick's Pepsi-Cola* ("*Krist Oil II*"), No. 04-C-187-C, 2005 U.S. Dist. LEXIS 7709, *9-10 (W.D. Wis. April 25, 2005) (granting summary judgment on Robinson-Patman claim due to absence of injury). Here, despite Plaintiffs' self-serving affidavits, none of the Plaintiffs could identify in their depositions any particular injury that purportedly occurred as a result of this phantom "price differential." (Dkt. 39, D. Dorsch Dep. 102:3-103:20); (Dkt. 42, J. Olson Dep. 51:18-52:16, 85:2-87:11); (Dkt. 41, T. Fohr Dep. 78:15-81:4, 9/29/2021); (Dkt. 43, T. Welch Dep. 66:8-67:11 9/23/2021). Further, Plaintiffs could not identify any specific customer or sale they lost as a result of the claimed "price differential." (Dkt. 39, D. Dorsch Dep. 102:3-103:20); (Dkt. 42, J. Olson Dep. 51:18-52:16, 85:2-87:11); (Dkt. 41, T. Fohr Dep. 78:15-81:4, 9/29/2021);

(Dkt. 43, T. Welch Dep. 66:8-67:11 9/23/2021). As Plaintiffs have not articulated (and cannot articulate) any injury, the Section 2(a) claim fails.

Plaintiffs' motion for summary judgment should be denied.

## II. PLAINTIFFS ARE NOT ENTITLED TO TO SUMMARY JUDGMENT ON THE NEW CLAIMS IN PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINT.

As this Court is aware, eight months after the deadline to amend, Plaintiffs filed a motion for leave to add entirely new claims to this litigation a mere *eight days* before the summary judgment deadline. Despite that these claims are not even part of this litigation – Plaintiffs have moved for summary judgment on them. As set forth in Ford's response to Plaintiffs' motion to amend (Dkt. 44), this is inappropriate and highly prejudicial to Ford. Regardless, Ford addresses these new claims here out of an abundance of caution, in the event Plaintiffs are allowed to add these new legal theories at such a late and prejudicial date. As noted in Ford's response to the motion to amend, both claims fail, and amendment would be futile in any event.

### A. Violation of Duty Of Good Faith and Fair Dealing

As noted above – in addition to Plaintiffs' efforts to add a good faith claim through a proposed Second Amended Complaint – Plaintiffs also seek a backdoor amendment *again* through their motion for summary judgment, and now try to amend their proposed violation of the duty of good faith and fair dealing claim (which is not even part of the litigation yet) into a claim under Wis. Stat. §401.304. Plaintiffs are not entitled to summary judgment on any "breach of good faith and fair dealing" – however they seek to recharacterize it – for the reasons set forth in Section II.E., *supra*.

### B. Violation of Duty Of Section 2(d) of The Robinson-Patman Act (15 U.S.C. § 13(d).

Implicitly conceding that there are no price differentials at issue here, Plaintiffs attempt to

salvage their claims through a last minute recharacterization of the issue as one falling under Section 2(d) of the Robinson-Patman Act (15 U.S.C. § 13(d)). This claim is not a part of the litigation, and Plaintiffs cannot obtain summary judgment on a claim that does not exist, but even if the Court were to allow such an untimely and prejudicial amendment and permit Plaintiffs to move for summary judgment on it, Plaintiffs' motion still fails. Section 2(d) states that:

> It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any **services or facilities** furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, **unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities**.

15 U.S.C. § 13(d).

As a threshold matter, Plaintiffs' claims fail because, as with the Section 2(a) claim, Plaintiffs cannot articulate any injury, which is a necessary prerequisite of any claim under Robinson-Patman. *See J. Truett Payne Co.*, 451 U.S. at 562, 68 (1981). As noted above, none of the Plaintiffs could identify any particular injury that purportedly occurred as a result of the LCP, as they could not identify any lost sale. (Dkt. 39, D. Dorsch Dep. 102:3-103:20); (Dkt. 42, J. Olson Dep. 51:18-52:16, 85:2-87:11); (Dkt. 41, T. Fohr Dep. 78:15-81:4, 9/29/2021); (Dkt. 43, T. Welch Dep. 66:8-67:11 9/23/2021). Moreover, Plaintiffs do not even make any effort in their Motion for Summary Judgment to try to articulate any such injury.[10] Having failed to identify any evidence in support of this necessary element, the claim necessary fails and Plaintiffs' motion for summary judgment should be denied.

---

[10] Instead, Plaintiffs rely upon *Woodman's Food Market, Inc. v. Clorox Co.*, 833 F.3d 743, 747 (7th Cir. 2016) for the proposition that they do not need to prove a competitive injury for section 2(d) claims. (Dkt. 51 at p. 49.) *Woodman's* says no such thing.

Further, even if the absence of actual damages wasn't fatal to the claim (which it is), Plaintiffs offer neither evidence nor authority for their theory that LCP monetary offset payments are a "service or facility" under Section 2(d). As Plaintiffs concede, the term is not defined in the statute. The Federal Trade Commission guidance on the term "services or facilities" in 16 C.F.R. § 240.7 shows the LCP offset payments associated with the facility would not fall into that category. There, the FTC provides the following list of promotional services and facilities covered by Sections 2(d) and (e):

> Cooperative advertising;
>
> Handbills;
>
> Demonstrators and demonstrations;
>
> Catalogues;
>
> Cabinets;
>
> Displays;
>
> Prizes or merchandise for conducting promotional contests;
>
> Special packaging, or package sizes; and
>
> Online advertising.

The LCP, which provides payments on a per vehicle basis to help offset the costs of participation, is none of those things, and there is no authority cited by Plaintiffs to support such an interpretation.[11] In fact, programs like the LCP that provide payments associated with

---

[11] Plaintiffs offer a single citation to *dicta* in a case noting that in other contexts and by other unidentified courts (or perhaps regulatory bodies) "warehouse facilities" have purportedly been considered a "service or facility" at some point somewhere. (Dkt. 51 at p. 47 citing *Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 484 F.3d 865, 871-72 (6th Cir. 2007).) Neither Plaintiffs nor the *Freightliner* opinion provide any information or analysis as to how (or even where or by whom) "warehouse facilities" have been considered a "service or facility," and Plaintiffs offer no analysis as to how this relates or is comparable in any way to the LCP.

dealership buildings and real estate are *not* a "service or facility." *See, e.g., Portland 76 Auto/Truck Plaza v. Union Oil Co.*, 153 F.3d 938 (9th Cir. 1998) (rent assistance is not a "service or facility); *Matthew Enter. v. Chrysler Grp. LLC*, Case No. 13-cv-04236-BLF, 2015 U.S. Dist. LEXIS 81339, at *19 (N.D. Cal. Jan. 12, 2015) (dismissing Robinson-Patman claim under 2(d) related to payments from auto manufacturer to dealer to assist with the rental costs of facility not a "service or facility" under Section 2(d), and was instead a repackaged 2(a) claim (which was also dismissed).

Further, even assuming Plaintiffs *could* identify a "service or facility," the Section 2(d) claim still fails because the LCP is offered on proportionally equal terms to all Lincoln dealers. Here, the LCP is available to all dealers and is the same for all dealers – each dealer has the opportunity to earn 2.75% of MSRP on every vehicle sold at retail. (Dkt. 37, M. DeYoung Dec. p. 5, 6, ¶¶ 31, 43.) Plaintiffs concede that the only reason they are not receiving the 2.75% is that they have chosen not to incur the costs it is designed to offset. (Dkt. 39, D. Dorsch Dep. 93:25-94:5); (Dkt. 40, W. Dorsch Dep. 35:6-19); (Dkt. 42, J. Olson Dep. 57:1-20); (Dkt. 41, T. Fohr Dep. 69:24-16); (Dkt. 43, T. Welch Dep. 52:4-9); (*See also* Dkt. 38 S. McDermott Dec. p. 1, ¶ 7). The rules are the same for all dealers, regardless of location or size. (*Id.*) Additionally, all of the dealers are free to sell as many vehicles as they can. (Dkt. 37, M. DeYoung Dec. p. 1. ¶ 4.)

Plaintiffs cite no authority for their assertion that the LCP, which is available to all dealers and which provides the same payment calculated in the same manner on per unit sales to retail customers, is in any manner not available on proportionally equal terms. In fact, the case they do cite, *Bouldis v. U.S. Suziki Motor Corp.*, 711 F.2d 1319, 1329 (6th Cir. 1983) actually supports the structure of the LCP. Strategically omitted from Plaintiffs' quotation from *Bouldis* is that the Court identifies a *per item payment* (like the LCP) as being appropriate and

proportionally available, and in fact approves the same:

> The Federal Trade Commission has stated that the best way to assure fairness in advertising allowances is to base the payments "on the dollar volume or on the **quantity of goods** purchased during a specified period."
>
> * * *
>
> The record shows that Suzuki based the allocation of co-op advertising funds **according to the number of motorcycles purchased** by a dealer. Under this plan, a **certain dollar amount for each model purchased** by the dealer would be credited to the dealer's co-op advertising fund.
>
> ***
>
> Therefore, since Suzuki allocated its advertising allowances pursuant to a plan acceptable to the Federal Trade Commission, we conclude that it was appropriate to grant summary judgment [in favor of Suzuki] on this issue as well.

(*Id.* (emphasis added).)  Under *Bouldis*, payments calculated on a per-vehicle basis (like the LCP payments) are available on a proportionally equal basis to all dealers.  As such, even if the LCP were construed to fall under 2(d) (which it does not), it is still available on a proportionally equal basis to all dealers.  Plaintiffs' motion for summary judgment should be denied.

## CONCLUSION

Discovery has confirmed what Ford has asserted from the beginning of this litigation. The LCP does not change the prices Plaintiffs pay for vehicles.  It does not require Plaintiffs to make any changes to their facilities that they do not want to make.  It does not take anything away from Plaintiffs.  Instead, the facility portion of the LCP provides those dealers who, unlike Plaintiffs, have elected to spend significant funds on upgraded Lincoln facilities, by providing funds to help offset those costs.  Plaintiffs have chosen to not upgrade their facilities  with respect to Lincoln.  That is a business decision they are free to make.  But Plaintiffs should not be permitted to demand consideration they have not earned by pretending this is a price change or a performance standard so they can improperly get a leg-up on their competitors who have

31

elected to invest in the Lincoln business.

Plaintiffs' motion for summary judgment should be denied.

Dated: December 2, 2021          Respectfully submitted,

/s/ Robert Hugh Ellis
Robert Hugh Ellis, 1057332
DYKEMA GOSSETT PLLC
39577 Woodward Ave., Suite 300
Bloomfield Hills, MI 48304
248-703-0718
rellis@dykema.com
**ATTORNEYS FOR DEFENDANT FORD
MOTOR COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2021, my assistant electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will provide notice of such filing to all parties and counsel of record.

*/s/ Robert Hugh Ellis*

**ATTORNEYS FOR DEFENDANT
FORD MOTOR COMPANY**