IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAHL AUTOMOTIVE ONALASKA INC.
dba DAHL LINCOLN, GARBO MOTOR SALES, INC.
dba GARBO LINCOLN, GRIFFIN FORD LINCOLN
FORT ATKINSON, INC., JIM OLSON FORD
LINCOLN, LLC, KAYSER FORD, INC., dba KAYSER
LINCOLN, KUNES COUNTRY FORD-LINCOLN,
INC., LIDTKE MOTORS, INC., THE MOTOR
COMPANY, INC. dba LINCOLN OF MARINETTE,
UPTOWN MOTORS, INC., V & H AUTOMOTIVE,
INC., Y & D CORP. dba DORSCH LINCOLN,

OPINION and ORDER

Plaintiffs,                                                      20-cv-932-jdp

v.

FORD MOTOR COMPANY
dba LINCOLN MOTOR COMPANY,

Defendant.

---

Plaintiffs are 11 Wisconsin dealers of Lincoln Ford vehicles. They are suing Ford Motor Company for violating the Robinson-Patman Act, several provisions of Wisconsin's motor vehicle dealer law, and the Uniform Commercial Code. Although plaintiffs are relying on multiple legal authorities, all of their claims arise out of the same conduct. Specifically, plaintiffs are challenging the legality of what Ford calls the Brand Exclusivity Standard, under which Ford pays its Lincoln dealers a percentage of the manufacturers suggested retail price for each vehicle sold if the dealer agrees to build (or already has) a showroom devoted exclusively to Lincoln vehicles.

Plaintiffs aren't contending that it is per se illegal to offer dealers incentives for building an exclusive showroom. But plaintiffs say that the structure of the incentive unfairly favors large dealers over small ones like them. Specifically, plaintiffs say that large dealers sell more

cars and therefore can use the incentive to recoup the costs of the showroom much faster than plaintiffs.

According to plaintiffs, it would take them so long to break even on the investment that it doesn't make financial sense to build a new showroom, especially because Ford could withdraw the incentive at any time, leaving them with millions of dollars of sunk costs. But if they don't participate in the program, they won't receive the incentive payments, which they believe puts them at a competitive disadvantage with dealers who can then use the payments to offer lower prices. So plaintiffs say that they are in a Catch 22: they either incur costs that they cannot afford or they allow themselves to be undersold by their competitors. Plaintiffs contend that both federal and state law prohibits Ford from forcing them to choose between two highly undesirable options.

Three motions are before the court: plaintiffs' motion for leave to amend their complaint and both sides' motions for summary judgment. Dkt. 31; Dkt. 33; Dkt. 45. The court will grant plaintiffs' motion for leave to amend, grant Ford's motion for summary judgment, and deny plaintiffs' motion for summary judgment.

Plaintiffs seek to amend their complaint to add two claims and voluntarily dismiss 7 of the 11 plaintiffs. Ford objects to the new claims, but Ford hasn't identified any unfair prejudice, and both sides included the new claims in their summary judgment motions, so the court will consider them.

On the merits, all of plaintiffs' claims fail. The court will assume for the purpose of the summary judgment motions that it isn't economically feasible for plaintiffs to construct a new showroom, even with the incentive payments from Ford. But it's undisputed that the exclusivity standard is optional, so dealers are free to continue operating without building an

exclusive showroom if they don't believe it is commercially reasonable for them to do so. Plaintiffs contend that the choice is illusory because declining to comply with the standard will mean that they forfeit the incentive payments that other dealers will receive, allowing those other dealers to use the payments to offer lower prices. But this argument is based on an assumption that those other dealers are receiving payments without incurring costs. It's undisputed that exclusive showrooms require a multimillion-dollar investment and that it would take several years of incentive payments for even plaintiffs' largest competitor to receive a return on its investment. Plaintiffs have adduced no evidence that the exclusivity standard is harming them now or will do so in the foreseeable future.

Most of plaintiffs' claims are based on a premise that exclusivity standard puts them at a competitive disadvantage. They have failed to show that a reasonable jury could rule in their favor on that issue, so defendants are entitled to summary judgment. Plaintiffs' remaining claims fail for other reasons, which the court will discuss below.

BACKGROUND

The background facts aren't disputed.

The four plaintiffs remaining in the proposed amended complaint are Lincoln Ford dealers in Sturgeon Bay (Jim Olson Ford Lincoln, LLC), Delavan (Kunes County Ford-Lincoln, Inc.), Beaver Dam (Lidtke Motors, Inc.), and Green Bay (Y & D Corp, which does business as Dorsch Lincoln). Each of the plaintiffs is challenging the validity of Ford's "Brand Exclusivity Standard," which is part of the Lincoln Commitment Program that Ford began implementing in 2020. Under the current version of the program, a dealer receives a payment for each Lincoln vehicle it sells if it meets the standard. The per-vehicle payment is equal to 2.75 percent of the

manufacturer's suggested retail price for a base vehicle, plus options. To satisfy the standard, a dealer must construct a showroom devoted exclusively to Lincoln vehicles, unless the dealer already has such a showroom. The new showroom must also meet design standards established by Ford. Ford believes that an exclusive showroom will help to increase Lincoln sales.

The required size of the showroom varies based on the dealership's expected annual sales of Lincoln vehicles. If a dealer is expected to have fewer than 100 annual sales, a two-car showroom would suffice. Dkt. 54 (McDermott Dep. 32:21–27). Ford estimates that the cost of such a showroom is between $2 and $2.5 million. *Id.* at 39:6–20. A dealership with 100 to 400 expected annual sales would need a four-car showroom at an estimated cost of $3 to $4 million. A dealership with more than 400 annual expected sales would need a six-car showroom at an estimated cost of $7 million. The estimated amounts identified by Ford do not include the cost of purchasing additional land or operating an additional showroom.

The commitment program includes more than just the exclusivity standard. Dealers can earn other payments as well. There is a 1.5 percent payment for providing certain services, such as car washes and loaner vehicles. There is another 1.5 percent payment for "improv[ing] the Certified Pre-Owned shopping experience." Dkt. 81, ¶ 42. Plaintiffs receive payments under those aspects of the program.

The commitment program is offered to dealers on one-year terms. So Ford can discontinue the payments provided under the program at the end of any term, regardless of whether a dealer has received a return on its investment at that point.

With the exception of Lidtke, plaintiffs have showrooms that combine Lincoln vehicles with other Ford vehicles. None of the plaintiffs are receiving incentive payments for complying with the exclusivity standard.[1]

Three of the plaintiffs have annual Lincoln sales of fewer than 100 vehicles. Dorsch's annual sales "sometimes exceed 100." Dkt. 76, ¶ 45. According to plaintiffs' expert, it would take Dorsch between 12 and 20 years to pay for the construction of a new showroom (depending on whether Dorsch was required to build a two-car or four-car showroom), assuming that Dorsch continued receiving 2.75 percent payments for each vehicle sold during that time. It would take Kunes more than 33 years; it would take Lidtke 39 years; and it would take Olson more than 170 years. Gordie Boucher, a Lincoln dealer near Milwaukee that sold 325 Lincolns in 2020, could use incentive payments to pay for the construction of a four-car showroom in less than seven years, according to estimates of plaintiffs' expert.

There are two Lincoln dealers in Wisconsin who are receiving the 2.75 percent payment for complying with the exclusivity standard: Gordie Boucher Lincoln in West Allis and Bergstrom Ford-Lincoln in Neenah.

The court has jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331 and over the state-law claims under both 28 U.S.C. § 1367 and § 1332. Plaintiffs are citizens of Wisconsin, Ford is a citizen of Delaware and Michigan, and plaintiffs have plausibly alleged that the amount in controversy is more than $75,000.

---

[1] The parties don't propose any facts about the status of Lidtke's showroom, but plaintiffs state in one of their briefs that "Lidtke already is exclusive." Dkt. 63, at 10 n.3. Plaintiffs don't explain what that means, but presumably Lidtke has an exclusive showroom that doesn't comply with Ford's design standards.

### I. MOTION FOR LEAVE TO AMEND

Eight days before dispositive motions were due, plaintiffs moved for leave to file a second amended complaint. Dkt. 31. The proposed complaint is narrower than the operative pleading in some respects and broader in others. *Compare* Dkt. 31-1 *with* Dkt. 23. It is narrower because it removes the claims of the following seven plaintiffs: Dahl Automotive Onalaska Inc., Garbo Motor Sales, Inc., Griffin Ford Lincoln Fort Atkinson, Inc., Kayser Ford, Inc., The Motor Company, Inc., Uptown Motors, Inc., and V&H Automotive, Inc. The proposed complaint also removes a request for damages on plaintiffs' claim under 15 U.S.C. § 13(a). Ford doesn't object to these changes. And the parties agree that the dismissal of Dahl, Garbo, Griffin, Motor Company, and V&H shall be with prejudice; the dismissal of Kayser and Uptown shall be without prejudice. Dkt. 94.

The proposed complaint is broader because it seeks to add a claim for injunctive relief under 15 U.S.C. § 13(d) and a claim for the breach of the implied duty of good faith and fair dealing. Ford objects to these new claims on the grounds of undue delay, unfair prejudice, and futility, which are all grounds for denying a request for leave to amend. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *Johnson v. Cypress Hill*, 641 F.3d 867, 872 (7th Cir. 2011).

The court isn't persuaded by plaintiffs' assertions that it could not have identified the new claims sooner. But the reason for this is that plaintiffs' new claims are based on the same facts as the other claims already in the case. Specifically, plaintiffs' proposed claims under § 13(d) and the duty of good faith are both challenges to the exclusivity standard based on a view that it is discriminatory against smaller dealers.

A plaintiff satisfies federal pleading standards so long as it gives the defendant fair notice of the factual basis of its claims. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014). The

plaintiff doesn't have to identify legal theories. *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). And "when a plaintiff does plead legal theories, it can later alter those theories." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540–41 (7th Cir. 2018) (internal quotation marks omitted).

That is what has happened here. Ford doesn't identify any relevant new facts in the proposed amended complaint, and it doesn't identify any additional discovery it needs to defend the new claims. In fact, Ford moved for summary judgment on both of the proposed new claims. Ford says that it was prejudiced by plaintiffs' late amendment, but the only prejudice that it identifies is that it had to scramble to include the new claims in its summary judgment motion. Ford's frustration is understandable, but circuit law allowed plaintiffs to raise new legal theories. "If [Ford] wished to minimize uncertainty concerning the scope of [plaintiffs'] claims, it could have served contention interrogatories." *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996).

Ford also contends that plaintiffs' new claims are futile, but that contention dovetails with Ford's summary judgment arguments. So the court will address the merits of the new claims in the context of discussing the parties' cross motions for summary judgment.

## II. MOTIONS FOR SUMMARY JUDGMENT

All of plaintiffs' claims raise different challenges to Ford's exclusivity standard, which is a program that offers dealers a 2.75 percent payment of the MSRP for each Lincoln vehicle they sell, but only if they agree to construct an exclusive showroom for Lincoln vehicles. Plaintiffs contend that the standard is unlawful for the following reasons:

- It is price discrimination, in violation of the Robinson-Patman Act, 15 U.S.C. § 13(a).

- It is discriminatory compensation for a "service or facility," in violation of the Robinson-Patman Act, § 15 U.S.C. § 13(d).

- It is coercive, in violation of the Wisconsin's motor vehicle dealer law, Wis. Stat. § 218.0116(1)(vm) and (wm).

- It is retaliation for plaintiffs' resistance to the coercion, in violation of Wisconsin's motor vehicle dealer law, Wis. Stat. § 218.0116(1)(z).

- It is an inequitable "performance standard," in violation of the Wisconsin's motor vehicle dealer law, Wis. Stat. § 218.0124.

- It is bad-faith price fixing, in violation of Mich. Comp. Laws § 440.2305.

- It is a breach of the duty of good faith and fair dealing, in violation of Mich. Comp. Laws § 440.13.

Both sides move for summary judgment on all of these claims.

## A. Robinson-Patman Act

The Robinson–Patman Act was passed in 1936 as an amendment to the Clayton Act of 1914. *Woodman's Food Mkt., Inc. v. Clorox Co.*, 833 F.3d 743, 746–47 (7th Cir. 2016). Section 2(a), which is codified at 15 U.S.C. § 13(a), prohibits price discrimination between different purchasers of similar commodities under certain circumstances. The purpose of the law was to remedy harm to competition caused by "powerful buyers" such as large chain stores, and other "enterprises with the clout to obtain lower prices for goods than smaller buyers could demand." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006). Sections 2(c), Section 2(d), and Section 2(e) were later enacted as 15 U.S.C. § 13(c)–(e) to address attempts

to conceal price discrimination through other favorable terms that large buyers could demand, such as paying for a buyer's advertising. *Woodman's*, 833 F.3d at 747–48; *Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of California*, 153 F.3d 938, 941–42 (9th Cir. 1998).

Plaintiffs assert claims under both § 13(a) and § 13(d). But they cannot prevail on both claims. This is because § 13(d) "exclude[s] claims that could fall within subsection 13(a)." *Woodman's*, 833 F.3d at 747. In other words, if Ford's conduct falls within § 13(a), it cannot also fall within § 13(d).

### 1.  15 U.S.C. § 13(a)

As relevant to this case, § 13(a) makes it illegal for a seller "either directly or indirectly, to discriminate in price between different purchasers of commodities . . . where the effect of such discrimination may be substantially to . . . injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination." 15 U.S.C.A. § 13(a). Ford challenges this claim on two primary grounds: (1) the payments dealers receive aren't a reduction of the "price" of the vehicles; and (2) plaintiffs haven't submitted evidence of injury to competition.

#### a.  Price discrimination

Price discrimination under § 13(a) simply means a price difference. *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960). In this case, it's undisputed that plaintiffs pay the same invoice price for a vehicle as all the other dealers. But plaintiffs point out that the invoice price isn't all that matters. "Whether price discrimination has occurred depends . . . on the price after all discounts, specials, and so on." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1407 (7th Cir. 1989). The court must also take into consideration anything that effectively lowers the price, including rebates and allowances. *See Fed. Ins. Co. v. Stroh Brewing*

*Co.*, 127 F.3d 563, 570 n.10 (7th Cir. 1997). Plaintiffs take this further, arguing that the 2.75 percent payment "can be legitimately viewed as a 'rebate' or 'allowance' attributable to the initial purchase of that vehicle, thereby reducing the 'actual net price' that the dealer receiving the [2.75 percent] payment has paid for that vehicle." Dkt. 51, at 51.

Plaintiffs cite no authority for their view that Ford's 2.75 percent payment is the equivalent of a rebate or allowance, and the court declines to extend the law as plaintiffs request. The obvious difference between a rebate or allowance and the payments at issue in this case are that rebates and allowances are essentially free money that a buyer receives without a corresponding cost or obligation. As plaintiffs repeatedly make clear throughout other portions of their briefs and proposed findings of fact, Ford's incentive payments are decidedly not free; they are tied to a dealer's commitment to spend millions of dollars constructing an exclusive showroom.

Plaintiffs say that tying the exclusivity payment to sales means that larger dealers that sell many more cars can use the payments to break even on their investment much faster than smaller dealers that sell fewer cars. Even if that is true, it doesn't mean that the payments result in *price discrimination*. Perhaps if the exclusivity payments exceeded the cost of the required investment, there would be a plausible argument that the payments were a disguised rebate or discount. *Cf. Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 571 (1990) (discounts to customer for providing services that would otherwise be provided by the seller may violate the Robinson-Patman Act when the discounts don't represent "a reasonable reimbursement" of the customer's costs). But that is not the case here. The exclusivity standard is part of the Lincoln Commitment Program, which Ford did not offer until 2020 and which expires each year. It's undisputed that Ford can withdraw the incentive payments at the conclusion of the one-year

term, regardless of whether the dealer has made a return on its investment. In other words, a dealer that enters the program is guaranteed only one year of payments in exchange for a multimillion-dollar investment. Even by plaintiffs' own calculations, the larger Wisconsin dealers could not break even on their investment for six or seven years.

So at this point it is unreasonable to suggest that the incentive payment is a discount, rebate, or allowance that reduces the price of the vehicle for the dealer. The cost of constructing a new showroom is much larger than one or two years of incentive payments. If Ford continues making the incentive payments for dealers even after they have recouped their costs, plaintiffs will have a stronger argument. But the claim is premature at best.

Plaintiffs resist this conclusion on two grounds. First, they note that one dealer, Gordie Boucher in West Allis, already has an exclusive showroom and that Ford isn't requiring that dealer to make any additional investments at this time. But plaintiffs cite no authority for the view that § 13(a) prohibits a seller from partially reimbursing a buyer for costs it has already incurred. Regardless of when Boucher incurred the costs (plaintiffs don't say how long ago it was), plaintiffs don't question that Boucher did in fact incur those costs and had to factor those costs into its prices. If Ford withheld an incentive payment designed to offset costs for an exclusive showroom simply because a dealer already incurred those costs, that itself could be considered discriminatory.

Second, plaintiffs say that Ford is offering "additional financial assistance" to other dealers for constructing an exclusive showroom. Dkt. 51, at 58. But that allegation is outside the scope of the complaint, and plaintiffs do not cite evidence that any additional assistance is related to the exclusivity standard or that Ford is providing such assistance on a discriminatory basis. In any event, plaintiffs do not explain why any additional assistance would violate the

Robinson-Patman Act or any other law on which plaintiffs are relying. So the court declines to consider that allegation.

### b. Injury

Plaintiffs fail to meet 13(a)'s injury requirement for a similar reason that they are unable to show price discrimination. Plaintiffs withdrew their request for damages on this claim, but they must still meet the requirements of the statute, under which they must show that "the effect of [Ford's] discrimination may be . . . to injure, destroy, or prevent competition" with other dealers. 15 U.S.C. § 13(a).

Plaintiffs are correct that they don't have to show that competition is harmed *now*. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–62 (1981). But plaintiffs haven't even adduced evidence that they "may" suffer a competitive injury as a result of the exclusivity standard. Plaintiffs' theory of harm is based on the view that dealers that accept the exclusivity standard will be able to undersell plaintiffs by using the 2.75 percent incentive payment to offer a lower price. But plaintiffs' theory is based on an assumption that other dealers are receiving those incentive payments without incurring any costs. Again, those dealers have either already constructed an exclusive, multimillion dollar showroom or they have committed to doing so in 2022. Plaintiffs offer no basis for inferring that the exclusivity standard gives their competitors an advantage at this time. The incentive payments are guaranteed for only a year at a time, and Ford didn't begin offering the payments until 2020, so it is premature to suggest that the standard will harm plaintiffs in the future.

Plaintiffs only evidence of potential injury is that the "sales effectiveness" of the two Wisconsin dealers that are participating in the exclusivity standard has increased an average of 17 percent between 2019 and 2021 while plaintiffs' "sales effectiveness" has decreased or

increased only modestly during the same period. Ford measures "sale effectiveness" of a Wisconsin Lincoln dealer by dividing a dealer's total annual sales by its expected sales, which Ford determines by multiplying the total registrations of luxury vehicles in the sales area by Lincoln's share of the registrations in the state. Dkt. 76, ¶ 66.

Even assuming that a difference in sales effectiveness could qualify as a competitive harm, plaintiffs haven't adduced any evidence of a causal connection between the exclusivity standard and the differences in sales effectiveness. For example, plaintiffs haven't shown that the trend in 2020 and 2021 is a departure from previous trends, that plaintiffs have lost any sales to the other dealers, or even that the two dealers are offering lower prices. *See Volvo Trucks*, 546 U.S. at 177 ("A hallmark of the requisite competitive injury, our decisions indicate, is the diversion of sales or profits from a disfavored purchaser to a favored purchaser.").

The court can discern no basis in the law for plaintiffs' assertions that Ford is engaging in price discrimination or that plaintiffs may suffer a competitive injury as a result of any price differences. Ford is entitled to summary judgment on this claim.

### 2.  15 U.S.C. § 13(d)

As an alternative to their claim under § 13(a), plaintiffs are asserting a claim under § 13(d), which makes it unlawful under certain circumstances

> to pay . . . compensation . . . for any services or facilities furnished by or through [a] customer in connection with the processing, handling, sale, or offering for sale of any products or commodities . . . sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d). The parties dispute four issues: (1) whether showrooms are "services or facilities" that are covered by the statute; (2) if so, whether the incentive payments are

"compensation for" the showrooms; (3) if so, whether Ford's incentive payments are "available on proportionally equal terms" to plaintiffs; and (4) if not, whether plaintiffs have evidence of an injury. The court concludes that Ford is entitled to summary judgment on issues (1) and (4), so it isn't necessary to consider the other issues.

### a. Services or facilities

As noted above, Congress enacted § 13(d) to close a "perceived loophole" in § 13(a) that allowed powerful buyers to obtain "de facto discounts" through free "promotional services" that weren't provided to other customers. *Woodman's*, 833 F.3d at 747–48. Relying on the purpose of § 13(d), as well as the Federal Trade Commission's interpretive guidance, the Court of Appeals for the Seventh Circuit has construed § 13(d) as "target[ing] only a narrow band of conduct that Congress identified as a problem: the provision of advertising-related perks to purchasers as a way around subsection 13(a)'s prohibition on price discrimination." *Id.* The court of appeals cited 16 C.F.R. § 240.7, which interprets § 13(d) as applying to "the services or facilities [that are] used primarily to promote the resale of the seller's product by the customer." Section 240.7 provides "some examples" of promotional services and facilities: cooperative advertising, handbills, demonstrators and demonstrations, catalogues, cabinets, displays, prizes or merchandise for conducting promotional contests, special packaging or package sizes, and online advertising.

Plaintiffs say that a showroom qualifies as a promotional facility under § 13(d) because it "aid[s] the buyer in reselling the product." Dkt. 51, at 55. But that expansive interpretation goes well beyond the court of appeals' view that § 13(d) is limited to "advertising-related perks." *Woodman's*, 833 F.3d at 747–48. Plaintiffs' interpretation would apply to a service department, a warranty, or any attractive feature of a vehicle. The court of appeals has rejected

the view that § 13(d) applies to "any product attribute that ma[kes] the product more desirable." *Id.* at 749.

Plaintiffs' view that a showroom is a promotional facility is also inconsistent with the list of examples provided by the FTC, all of which are directly related to advertising campaigns. The FTC's list is not exhaustive, but it is instructive of what qualifies as a service or facility under § 13(d). *See Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 383 (7th Cir. 2020). A showroom bears no resemblance to any of the items of the list.

Distilled, plaintiffs' position is that a showroom is a promotional facility because it is where the sale of the vehicle occurs. If the text of § 13(d) were given its most expansive interpretation, plaintiffs' view might prevail. But, as noted above, both the court of appeals and the FTC have construed § 13(d) narrowly. Plaintiffs cite no other authority for their view. Rather, in the cases discussed by the parties, the courts concluded that buildings where sales occurred were not promotional facilities. *See Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of California*, 153 F.3d 938, 946 (9th Cir. 1998); *Hinkleman v. Shell Oil* Co., 962 F.2d 372, 380 (4th Cir. 1992). For example, in *Hinkleman*, which *Woodman's* cited with approval, 833 F.3d at 748, the court concluded that a gas station wasn't a promotional facility because it "merely facilitate[s] [the plaintiff's] resale of gasoline." 962 F.2d at 380. Plaintiffs point out that these cases involved leased buildings rather than buildings owned by the customer. But the court isn't persuaded that the distinction between leased versus owned informs whether a building is properly viewed as promotional.

In light of the court of appeals' narrow reading of § 13(d), the FTC's interpretive guidance, and the lack of case law supporting plaintiffs' position, the court concludes that payments for a showroom don't fall within the scope of § 13(d).

15

### b. Threatened loss or damage

Even if plaintiffs met the requirements of § 13(d), their claim would still fail for lack of evidence about harm. Plaintiffs point out § 13(d), unlike § 13(a), doesn't require the plaintiff to point to a competitive injury. *See Woodman's*, 833 F.3d at 747. But plaintiffs still must comply with 15 U.S.C. § 26, which allows a plaintiff to sue for injunctive relief "against threatened loss or damage" caused by a violation of § 13, but only when the plaintiff meets the requirements for obtaining injunctive relief in any other case.

As an initial matter, plaintiffs don't explain what injunctive relief they believe they are entitled to. The only remedy suggested in their briefs is to direct Ford to give them the 2.75 percent incentive payments without a corresponding commitment to building an exclusive showroom. But that would be discriminatory against other dealers who have incurred substantial costs in order to get the incentive.

In any event, plaintiffs haven't shown irreparable harm, which is one of the requirements for injunctive relief under § 26. Plaintiffs' theory of harm is based on their view that the 2.75 percent incentive payment allows other dealers to undersell them. But plaintiffs' own evidence shows that the incentive payments—which are guaranteed for only a year at a time—aren't sufficient at this point to offset the costs of a multimillion-dollar showroom.

The court will grant Ford's motion for summary judgment on plaintiffs' claim under § 13(d).

## B. Motor vehicle dealer law

Section 218.0116 of the Wisconsin Statutes gives the Wisconsin Department of Transportation the authority to deny, revoke, or suspend an automobile manufacturer's license to do business in the state if the manufacturer does any one of a long list of things identified

in the statute.[2] Section 218.0163(1)(a) gives dealers the right to sue over some of the conduct prohibited by § 218.0116, including the conduct prohibited by the subsections that plaintiffs are relying on in this case. Plaintiffs contend that Ford is violating § 218.0116 by: (1) attempting to coerce them to improve their dealership facilities; (2) attempting to coerce them to maintain exclusive facilities; (3) retaliating against them for resisting the attempts to coerce them; and (4) imposing an unfair performance standard on them.

### 1. Section 218.0116(1)(vm)

This provision prohibits a manufacturer from "coerc[ing] or attempt[ing] to coerce a dealer or prospective dealer to improve dealership facilities at a substantial cost to the dealer or prospective dealer." Wis. Stat. § 218.0116(1)(vm). The provision doesn't apply if "the reasonable business considerations of the manufacturer and dealer justify improvement of dealership facilities" or if "the dealer or prospective dealer has agreed to undertake the improvement and received a separate and valuable consideration for the improvement." *Id*. The parties dispute whether the exclusivity standard is coercive and whether the standard falls into either of the two exceptions to the general prohibition identified above. The court concludes as a matter of law that the standard is not coercive, so isn't necessary to consider the other two issues.

The statute doesn't define the word "coerce," and the parties cite no case law construing it. In this situation, the court may apply the ordinary meaning of the term, looking to dictionaries for guidance. *Duncan v. Asset Recovery Specialists, Inc.*, 2022 WI 1, ¶ 11, 400 Wis. 2d 1, 968 N.W.2d 661, 665; *State v. Lasecki*, 2020 WI App 36, ¶ 30, 392 Wis. 2d 807, 827–

---

[2] The parties assume that Wisconsin law applies to the state statutory claims, so the court will do so as well. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002).

28, 946 N.W.2d 137, 147. The ordinary meaning of "coerce" is to compel by threat or force, either physically or through economic means.[3]

Plaintiffs acknowledge the ordinary meaning of the term, but they ask the court to view as instructive the examples of "adverse actions" in § 218.0116(1)(z), which include "[w]ithholding, reducing, or delaying an incentive or other payment" and "[e]stablishing or applying a discriminatory standard." But the statute doesn't equate the meaning of "coerce" with "adverse action." And it wouldn't make sense to do so. Section 218.0116(1)(z) is a retaliation statute; it prohibits conduct that is performed for specific reasons, *regardless* of its coercive effect. Equating acts that "coerce" with "adverse actions" would lead to a definition of "coerce" that is overly broad in some respects and overly narrow in others. It would be overly broad because the listed adverse actions are not necessarily coercive; they are simply perceived by the legislature as inappropriate. For example, acting in bad faith is an adverse act. *Id.* § 218.0016(1)(z)1.f. At the same time, many potentially coercive acts are not identified as "adverse actions" in the statute. For example, terminating a dealership agreement is not one of the listed adverse actions. So the court will apply the ordinary meaning of the word.

Much of plaintiffs' discussion about coercion relates to their assertion that the incentive payments for complying with the exclusivity standard are a much more attractive option for larger dealers than smaller dealers because larger dealers can recoup their costs faster. But even if it is true that constructing an exclusive showroom doesn't make financial sense for plaintiffs, that's not evidence that Ford is attempting to coerce plaintiffs to build a new showroom. If anything, it would be evidence that Ford wants to dissuade plaintiffs from doing that. It's

---

[3] *Coerce*, Merriam-Webster, https://www.merriam-webster.com/dictionary/coerce; *Coercion*, Black's Law Dictionary (11th ed. 2019).

undisputed that the exclusivity standard is optional. So if plaintiffs believe that the incentive provided by Ford isn't adequate to cover their costs, they may opt out of the program.

Any coercive effect of the exclusivity standard must come from the adverse consequences of opting out of the standard. Plaintiffs' claim fails on this point, for the same reason that their claims under the Robinson-Patman Act failed. Plaintiffs say that they feel coerced to participate in the exclusivity standard because the dealers who do participate get the 2.75 percent incentive payment, which allows dealers to offer lower prices. But as discussed in the context of plaintiffs' Robinson-Patman Act claims, this argument disregards the cost of constructing an exclusive showroom. Plaintiffs have adduced no evidence that the incentive payments are giving participating dealers a competitive advantage, so plaintiffs have no basis for alleging that the exclusivity standard is coercive.

The court will grant Ford's motion for summary judgment on plaintiffs' claim under § 218.0116(1)(vm).

### 2. Section 218.0116(1)(wm)

This statute is similar to § 218.0116(1)(vm). Instead of prohibiting a manufacturer from coercing a dealer "to improve dealership facilities," it prohibits a manufacturer from coercing a dealer "to provide or maintain exclusive facilities for a particular line make of motor vehicles." Wis. Stat. § 218.0116(1)(wm). Plaintiffs' argument under this statute is based on the same understanding of "coerce" that they asserted for their claim under § 218.0116(1)(vm). So this claim fails for the same reason.

### 3. Section 218.0116(1)(z)

Among other things, this section prohibits a manufacturer from taking an "adverse action" against a dealer "in retaliation for a dealer's exercising a right" under the motor vehicle

dealer law. Wis. Stat. § 218.0116(1)(z). The statute specifies nine adverse actions, including "increasing a price charged for services or goods," "withholding, reducing, or delaying an incentive or other payment," "establishing or applying a discriminatory standard," and "failing to act in good faith." *Id.*, § 218.0116(1)(z)1. Plaintiffs contend that the exclusivity standard qualifies as each of those adverse actions and that Ford is retaliating against plaintiffs for "exercising their rights under § 218.0116(1)(vm) and 218.0116(1)(wm) to not improve their dealership facilities or provide exclusive facilities for the Lincoln line." Dkt. 51, at 40.

This claim is contingent on a finding that Ford violated § 218.0116(1)(vm) or § 218.0116(1)(wm). The court has rejected both of those claims, so Ford is entitled to summary judgment on this claim as well.

### 4.   Section 218.0124

Under this section, a "performance standard or program for measuring dealership performance that may have a material effect on a dealer and the application of any such standard or program by a manufacturer, importer or distributor, shall be fair, reasonable and equitable." Wis. Stat. § 218.0124. Section 218.0116(1)(km) prohibits a manufacturer from violating § 218.0124, and violations of § 218.0116(1)(km) can be enforced under § 218.0163(1)(a).

Plaintiffs contend that the exclusivity standard is a "performance standard or program for measuring dealership performance." And they contend that the standard is inequitable and "may have a material effect" on them because it isn't commercially reasonable for them to meet the standard and because it gives larger dealers a competitive advantage.

The court isn't persuaded that a manufacturer's offer to make payments in exchange for a commitment to build an exclusive showroom is a "performance standard." Plaintiffs say

that one definition of performance is simply "the execution of an action," and that constructing an exclusive facility meets that definition. But when a statute doesn't define a term, as in this case, courts should generally give the term its "most natural reading." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 410 (2011); *State v. Iverson*, 2015 WI 101, ¶ 35, 365 Wis. 2d 302, 871 N.W.2d 661. Plaintiffs' interpretation of the statute is strained. Under a "commonsense conception," *Carachuri-Rosendo v. Holder*, 560 U.S. 563, 573–74 (2010), one would not view an incentive to build a showroom as a standard of "performance." As the statute itself makes clear, "performance" is something that can be "measur[ed]," not simply executed. Though there is little case law interpreting § 218.0124, other cases asserting claims under that statute have involved standards for measuring sales or customer service, which is consistent with the natural reading of the term. *See Northgate Motors, Inc. v. Gen. Motors Corp.*, 111 F. Supp. 2d 1071, 1073 (E.D. Wis. 2000); *Ralph Gentile, Inc. v. State, Div. of Hearings & Appeals*, 2011 WI App 98, ¶ 3, 334 Wis. 2d 712, 800 N.W.2d 555; *Racine Harley-Davidson, Inc. v. Harley-Davidson Motor Co.*, 2008 WI App 135, ¶ 19, 313 Wis. 2d 831, 756 N.W.2d 810.

Plaintiffs' reading of § 218.0124 is also inconsistent with the broader structure of the motor vehicle dealer law. Sections 218.0116(1)(vm) and (wm) specifically address restrictions on a manufacturer's ability to induce a dealer to improve a facility or construct a new one. If the court were to read § 218.0124 as plaintiffs suggest, there would be little purpose for those other, more specific provisions. *Sw. Airlines Co. v. Dep't of Revenue*, 2021 WI 54, ¶ 23, 397 Wis. 2d 431, 960 N.W.2d 384 ("We . . . interpret statutory language in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes." (internal quotation marks omitted)). Plaintiffs identify no

circumstance under which an incentive to build or improve a facility would be coercive, but not unfair, unreasonable, or inequitable.

But even if the exclusivity standard were a measure of performance, this claim would fail because plaintiffs haven't adduced evidence that the standard "may have a material effect" on them. Plaintiffs say that the standard may have a material effect on them because its commercially unreasonable for them to construct an exclusive showroom and because dealers who comply with the standard will have a competitive advantage over plaintiffs.

Plaintiffs have disavowed any intention to comply with the exclusivity standard, so there is no basis for inferring that the standard will harm plaintiffs by strapping them with costs that they can't afford. And, as discussed in previous sections of the opinion, plaintiffs haven't adduced evidence that dealers who comply with the standard will be able to use the incentive payments to undersell plaintiffs in the foreseeable future.

The exclusivity standard isn't a measure of plaintiffs' performance and plaintiffs haven't adduced evidence that the standard may have a material effect on them. The court will grant Ford's summary judgment motion on this claim.

## C. Contract

Plaintiffs also assert claims for breach of the dealership agreement and the Uniform Commercial Code. Plaintiffs acknowledge that the agreement is governed by Michigan law, Dkt. 75, at 21 n.5, and neither side challenges the choice-of-law provision, so the court will apply Michigan law to the contract claims.

### 1. Mich. Comp. Laws § 440.2305

Under this statute, "[a] price to be fixed by the seller or by the buyer means a price for him to fix in good faith." Mich. Comp. Laws § 440.2305(2). As plaintiffs acknowledge, Dkt. 63,

at 16–17, this claim rests on plaintiffs' contention that the incentive payments that Ford gives to dealers for complying with the exclusivity standard are price reductions. The court has rejected that contention under the Robinson-Patman Act, and plaintiffs don't identify any differences under Michigan law that would require a different conclusion on the contract claim. So Ford is entitled to summary judgment on this claim.

### 2.  Mich. Comp. Laws § 440.1304

This statute imposes a duty of good faith on parties to a contract. Plaintiffs contend that Ford is breaching that duty because the exclusivity standard "does not provide the plaintiffs with proportionally equal benefits compared to other Lincoln dealers." Dkt. 51, at 49.  Ford challenges this claim on multiple grounds: (1) Michigan law requires a plaintiff bringing a bad-faith claim to identify a discretionary contractual provision that the defendant is abusing, but plaintiffs failed to do that in their complaint; (2) the provisions that plaintiffs cited in their summary judgment briefs aren't related to the exclusivity standard; (3) there is no bad faith because the exclusivity standard is designed to help dealers offset the costs of constructing a showroom, not to treat dealers unequally.

The parties agree that Michigan courts recognize an implied duty of good faith when a contract makes the manner of one party's performance "a matter of its own discretion." *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 690 (Mich. 1975). The duty serves as a gap-filler, "supply[ing] limits on the parties' conduct when their contract defers decision on a particular term, omits terms or provides ambiguous terms." *Hubbard Chevrolet Co v. Gen. Motors Corp*, 873 F.2d 873, 876–877 (5th Cir. 1989) (applying Michigan law).

Ford is correct that plaintiffs' complaint doesn't identify a provision in the parties' dealership agreements that Ford failed to perform in good faith. In their opening summary

23

judgment brief, plaintiffs cite a provision in the preamble to the agreement, which states that Ford "conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs." Dkt. 50-22, at 6. In their brief in opposition to Ford's summary judgment motion, plaintiffs cite two more provisions. First, they cite a provision stating that "[t]he DEALERSHIP FACILITIES shall be substantially in accordance with the GUIDES therefor established by [Ford] from time to time." Dkt. 50-23, at 11. Second, they cite a provision stating that "[t]he Dealer shall not move or substantially modify or change the usage of any of the DEALERSHIP LOCATION or FACILITIES for COMPANY PRODUCTS . . . without the prior written consent of [Ford]." *Id.*

Even if the court assumes that plaintiffs weren't required to identify these provisions in their complaint, plaintiffs have failed to show how they relate to the exclusivity standard. The preamble provision is about marketing and advertising. As already discussed, the exclusivity standard isn't about those things. The other two provisions do relate to dealership facilities, but they are requirements to comply with Ford's "guides" and to obtain consent to move or modify the dealership. These provisions don't refer to the Lincoln Commitment Program or the Brand Exclusivity Standard. More generally, they have nothing to do with incentive programs.

In any event, plaintiffs haven't adduced evidence that Ford acted in bad faith. Plaintiffs contend that Ford is acting in bad faith because it "does not provide the plaintiffs with proportionally equal benefits compared to other Lincoln dealers." Dkt. 51, at 49. By this, plaintiffs mean that it is unfair to condition the 2.75 percent incentive payment on constructing an exclusive facility because larger dealers sell more cars than smaller dealers, so

larger dealers can recoup their costs faster than smaller dealers. But plaintiffs cite no authority from Michigan or anywhere else that offering dealers the same per-vehicle payments on the same terms qualifies as bad faith under contract law. Plaintiffs' reliance on the concept of "proportional equality" comes from the Robinson-Patman Act, but that is a federal law with a primary purpose of protecting small businesses. *Volvo Trucks*, 546 U.S. at 175. In the absence of clear authority supporting plaintiffs' view, the court declines to read in a prohibition against "disparate impact" in every Michigan contract.

The court will grant Ford's summary judgment on plaintiffs' bad-faith claim.

ORDER

IT IS ORDERED that:

1. Plaintiffs' motion for leave to amend their complaint, Dkt. 31, is GRANTED. Plaintiffs Dahl Automotive Onalaska Inc., Garbo Motor Sales, Inc., Griffin Ford Lincoln Fort Atkinson, Inc., The Motor Company, Inc., and V&H Automotive, Inc. are DISMISSED with prejudice. Plaintiffs Kayser Ford, Inc. and Uptown Motors, Inc., are DISMISSED without prejudice.

2. Defendant Ford Motor Company's motion for summary judgment, Dkt. 33, is GRANTED, and plaintiffs' motion for summary judgment, Dkt. 45, is DENIED. Plaintiffs Jim Olson Ford Lincoln, LLC, Kunes County Ford-Lincoln, Inc., Lidtke Motors, Inc., and Y & D Corp. are DISMISSED with prejudice.

3. The clerk of court is directed to enter judgment in favor of Ford and close this case.

Entered February 28, 2022.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge